**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA**

| |
|---|
| UNITED STATES OF AMERICA<br><br>               Plaintiff,<br>    vs.<br><br>ANDREA LAVELLE VICKERS,<br><br>               Defendant. |

3:11-cr-063-HRH-JDR

<u>**RECOMMENDATION
REGARDING
MOTIONS TO SUPPRESS**</u>

(Docket Nos. 13 & 14)

Defendant **Andrea Lavelle Vickers** moves to suppress evidence seized from a vehicle he was driving on March 22, 2011. Docket 13. In a separate motion he moves to suppress evidence seized from his person and effects at the Anchorage Jail where he was taken following his arrest, which he asserts was invalid. Docket 14. The motions are opposed by the government. Docket 20. An evidentiary hearing was conducted on September 12, 2011 before the assigned

magistrate judge. Upon due consideration of the evidence adduced and arguments of counsel, the magistrate judge recommends that the court adopt the findings of facts and conclusions of law as set forth below and that the motions to suppress be ***granted as to the inventory search and denied as to the search of Vickers person at the jail.***

### Standing

The motions to suppress were timely filed on August 12, 2011. In its opposition the government challenged the defendant's standing to move to suppress the evidence seized from the vehicle. In order to contest the legality of a search or seizure, the defendant must establish that he or she had a "legitimate expectation of privacy" in the place searched or in the property seized. Rakas v. Illinois, 439 U.S. 128, 143-44 (1978). The defendant must have exhibited an actual, subjective expectation of privacy and, more importantly, the expectation must be one that society is prepared to accept as reasonable and therefore legitimate. Smith v. Maryland, 442 U.S. 735 (1979); United States v. Pollock, 726 F.2d 1456, 1465 (9th Cir.1984). Vickers has the burden of establishing that, under the totality of the circumstances, the search or seizure violated his legitimate expectation of privacy in a particular place. Rawlings v. Kentucky, 448 U.S. 98, 104 (1980).

The evidence establishes the defendant's right to assert the standing. Vickers has shown a legitimate basis for possessing the vehicle, namely permission

from the vehicle owner, to support his standing and reasonable expectation of privacy in the vehicle. United States v. Perez, 689 F.2d 1336, 1338 (9th Cir.1982) (defendants had a legitimate expectation of privacy in a truck they did not own); United States v. Portillo, 633 F.2d 1313, 1317 (9th Cir.1980) (defendant had a legitimate expectation of privacy in a car he did not own because he was in possession of the car with the permission of the owner and had a key to it, thus having the requisite level of control over the car), cert. denied, 450 U.S. 1043 (1981). United States v. Garcia, 897 F.2d 1413, 1417-18 (7th Cir. 1990) (driver using vehicle with permission of absent owner has reasonable expectation of privacy therein); United States v. Rubio-Rivera, 917 F.2d 1271, 1275 (10th Cir. 1990) (permission from owner to use vehicle supports privacy expectation therein).

United States v. Padilla, 111 F.3d 685, 687 (9th Cir. 1997), relied upon by the government prior to the evidentiary hearing, is distinguishable on its facts. Padilla was not driving the vehicle nor did he own it when it was stopped. The issue was whether a bailment relationship between defendants and the owner of the car whom the defendants hired to transport cocaine conferred on the defendants a possessory interest in the car protected from unreasonable search and seizure.

After the Ninth Circuit Court of Appeals found that the Padillas had standing to contest the search, the case was remanded by the U.S. Supreme Court for determination of whether the Padillas had a property interest that was interfered

with by the stop of the car, or a reasonable expectation of privacy that was invaded by the search. The Ninth Circuit affirmed the district court's holding that the defendants lacked standing.

## Findings of Fact

On at March 22, 2011, at about 1:30 AM Anchorage Police Officer Troy Clark was proceeding westbound on DeBarr approaching the intersection of Bragaw when he observed a Mercury Mountaineer proceeding with one headlight working. It was dark outside. Officer Clark turned his vehicle around and followed the Mercury Mountaineer. While doing so he notice that the tail lights of vehicle were not turned on.

The officer activated his overhead lights in his marked vehicle and followed the Mercury about 4 to 6 blocks before it pulled over. Officer Clark observed the Mercury swerving and the turn signal turning on and off several times before the driver pulled over. He also observed the vehicle drift over to a parking lane on the side of the road and come back into the traffic lane while turning the turn signal off and on. It appeared to the officer that the driver was preoccupied.

Officer Clark had no idea who was driving the vehicle until it actually stopped. He asked the driver, who was alone, for his driver's license, his insurance, and his registration. The driver was Andrea Vickers who was known to the officer. After producing his driver's license Vickers provided a registration indicating that the

car belonged to Jennifer Granvold.  Vickers had borrowed the vehicle from Granvold.  She gave him the keys to the vehicle and he had driven the vehicle on prior occasions.

Vickers was unable to provide the officer with an insurance card.  At some point, Vickers indicated to the officer that he was talking to the owner of the vehicle on the phone.  Vickers told Officer Clark that the owner said that the car was insured through Geico.  The officer went back to the patrol car and called the Geico Company on an 800 number to see if they had any record of insurance for a vehicle with that VIN number or under the name of Granvold or Vickers.  Geico had no record of anybody being insured for that vehicle.

As soon as Officer Clark saw that it was Andrea Vickers driving the vehicle he called for backup.  He knew that Vickers had been involved in weapons crimes in the past and had safety concerns.  Once he received the information from Geico about the absence of insurance Officer Clark decided to arrest Vickers for a violation of AMC 9.28.030A.[1]

Anchorage Police Officer Michael Wisel arrived at the scene at about 1:35 AM to assist Officer Clark with the traffic stop.  At the time of his arrival Officer

---

[1] 9.28.030 Insurance or other security required.
    A.  The owner or operator of a motor vehicle shall have a current motor vehicle liability policy, or other security that complies with Alaska Statutes Title 28, when operating the vehicle within the municipality.

Clark was verifying whether Vickers had insurance on the vehicle. Officer Wisel also had safety concerns about Vickers based on prior experience in which Vickers was a victim in a reported drive-by shooting.

After Officer Clark decided to arrest Vickers for driving without insurance he and Officer Wisel walked up to the Mercury and had Vickers get out of the vehicle. Officer Clark placed Vickers in handcuffs, did a pat-down search and took him to his police vehicle. The pat-down search disclosed soap but nothing that concerned the officer.[2] Officer Clark then started the paperwork for the charge of driving without insurance in violation of the Municipal Code. Neither officer asked Vickers for permission to search the vehicle.

Officer Wisel began an inventory search and quickly came back and informed Officer Clark that he had found a gun in the car. Officer Clark had just run Vickers criminal history and knew that he was a felon and not allowed to have a gun. Officer Clark then decided to charge Vickers with being a felon in possession of a firearm in violation of Alaska State law. He knew that the State's attorney's office would want to handle the entire case so he decided to charge Vickers with driving without insurance under Alaska State law rather than the Municipal Code.

---

[2] Apparently Officer Clark did not discover the baggie of about twenty .22 caliber bullets on defendant's person that was later found at the jail.

Officer Wisel had conducted many inventory searches in the past. He was a field training officer and had instructed other officers about the police policy for inventory searches. He was aware that the inventory policy stated that he could only look for items in plain view. He testified that typically his inventory searches of vehicles were for high value items, that if there was a coat he would lift the coat and also look underneath the seats where people might stash valuables to conceal them.

On cross-examination Officer Wisel was asked about his standard policy in moving things during an inventory search. He testified that he would not open up a gym bag, but if it were already open he would look inside. He stated that he would probably look inside a purse to see if there was a gun if he could do so without manipulating it.

He knew that one of the reasons for an inventory search was to protect the police against liability claims. When asked about looking for valuable items in the vehicle during an inventory search he added "and for safety reasons . . ." explaining that an officer conducting an inventory search needs to document or remove firearms, propane bottles, and other such items for safety concerns particularly because impound yards are not totally secure. Officer Wisel testified that he usually looks in a center console or glove box if it is unlocked.

When Officer Wisel arrived at Vickers' vehicle the driver's door was open. He stepped inside and saw a black bandana between the driver's seat and the

center console. A large part of the bandana was folded over towards the console. It looked to the officer that something was being concealed under the bandana although he could not see what it was until after he moved the bandana. Officer Wisel never testified that he thought the bandana was concealing a firearm. He merely said it could have been something of value.

Because of the location of the bandana next to the seat belt buckle anyone fastening the driver's seatbelt would have been aware that there was an object under the bandana. Officer Wisel pulled on the corner of the bandana and saw what appeared to be the butt of a gun. He then stopped his search and notified Officer Clark that there was a weapon in the vehicle.

Officer Wisel returned to his vehicle, retrieved a camera, and took pictures of the bandana before he removed the pistol. Officer Wisel admitted that he could not see the pistol until he moved the bandana. He agreed that the bandana was not a thing of value.

An inventory search is conducted by APD on all impounded vehicles. Once Officer Clark decided to charge Vickers under the State law, Officer Wisel recognized that the vehicle would not be impounded. He knew that he could not search any further without a search warrant. The keys to the vehicle were given back to Vickers and he was transported to the jail.

Before Department of Correction officers admit a person into the Anchorage jail they conduct a search of his person. The correction officers searched Vickers and located a plastic sandwich baggie of about twenty .22 caliber bullets in his right pocket. Tr. 55. Officer Clark was standing nearby waiting for the return of his handcuffs. He observed the correction officer remove the ammunition from the defendant's pocket. The correction officer handed the bullets directly to Officer Clark who took custody of them and stored them in evidence at APD.

Officer Clark testified that he would have arrested Vickers based just on driving without insurance because of Vickers' criminal convictions. He would not have allowed Vickers to drive the vehicle away without insurance because that would constitute a continuing violation of the law.

The state magistrate set bail for the two offenses at $750 designating $500 for the weapons charge and $250 for the charge of driving without insurance. According to Officer Clark, if there is a chance that a person arrested is going to make bail they are not always stripped searched. They would have their picture and finger prints taken before leaving the jail facility. Municipal Code 9.28.026 E.3 allows the seizure of a motor vehicle for impound upon a showing of probable cause to believe the vehicle was operated in violation AMC 9.028.030.

**Discussion**

## A.    Legality of Stop

Vickers was lawfully stopped by Officer Troy Clark after the officer observed that one headlight of the vehicle was not working and no tail lights were on.  When the officer asked the driver, later identified as Andrea Vickers, for a driver's license, registration and proof of insurance, Vickers could not produce any proof of insurance as required by Anchorage Municipal Code (AMC) 9.28.030. The defendant was properly placed under arrest for operating a vehicle without insurance.

## B.    Validity of Inventory Search

The Fourth Amendment to the U.S. Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."

Officers may conduct an inventory search to document the vehicle's contents once the vehicle is lawfully seized by police.  South Dakota v. Opperman, 428 U.S. 364 (1976).  Such searches serve the purpose of protecting the police from danger, protecting police against bogus claims and disputes over lost or stolen property; and protection of the owner's property while it remains in police custody.  *Id.* at 377; United States v. Wanless, 882 F.2d 1459, 1463 (9th Cir. 1989).  Inventory searches must be conducted pursuant to "standard criteria and on the basis of

something other than suspicion of evidence of criminal activity." <u>Colorado v. Bertine</u>, 479 U.S. 367 (1987).

The Municipality of Anchorage has a policy for towing and impounding vehicles. <u>See</u> 3.03.010 of the Operational Procedures in the Regulations and Procedurals Manual for the Anchorage Police Department (Government's Exhibit 1). This policy permits impounds for vehicles involved in a violation pursuant to AMC 9.28.026 (Driving without insurance) One of the criteria for impounds is stated in Section I.B.3 of that Policy as follows:

> Personal property which is in plain view inside the vehicle, and is determined to be valuable by the arresting officer, or by the defendant, must be documented in the inventory section of the impound report or in the narrative section of the report.

Both the government and Vickers agree that the inventory search in this case must have been carried out in accordance with the standard procedure of the local police department. <u>See</u> <u>Opperman</u>, <u>supra</u> at 375. An improper inventory search results in suppression where the police fail to follow the local policy. <u>See</u> <u>Wanless</u>, 882 F.2d at 1463 (1989) (police failed to follow local policy of asking a present owner for consent).

Vickers argues that the inventory search conducted by Officer Wisel exceeded the scope of the Anchorage Police Department Policy. He argues that the gun located under the bandana was not in "plain view" observation but was visible only after the policeman moved the bandana within the vehicle. The initial question then is whether the discovery of the gun occurred within the meaning of "plain view" as that language is contained in the Municipal Code.

The Anchorage Municipal Code does not define the meaning of "plain view" in its criteria for impoundment. Alaska case law does not provide a definitive guideline as to the meaning of "plain view" as used in AMC 9.28.026. Under the ordinary meaning of "plain-view doctrine" the rule permits a police officer's warrantless seizure and use as evidence of an item seen in plain-view from a lawful position. <u>See</u> definition of Plain View Doctrine in <u>Blacks Law Dictionary</u>, 9th Ed.

In an unpublished opinion in <u>Putzel v. State of Alaska</u>, No. A-6095, 1997 WL 593806 (Alaska Ct. App. Sept 24, 1997) the Court of Appeals of Alaska affirming the Superior Court addressed the validity of an inventory search pursuant to AMC 9.28.026 which authorized impoundment for a vehicle involved in a driving while intoxicated violation. That code provision provided: "Personal property which is in plain view inside the vehicle, and is determined to be valuable by the arresting officer, or by the defendant, must be taken for safe keeping and noted in the official report." *Id.* at 2.

In Putzel an officer lifted a blanket to see if there might be more money or other objects which Putzel would want to take with him. In doing so they found a revolver. Putzel argued that the search violated Anchorage Police Department regulations. The Alaska Court of Appeals did not view the officers actions of moving the blanket as inconsistent with Anchorage Police Department General Order No. 94-1(c). In Putzel, however, the Court assumed that a blanket qualified as valuable personal property. The court held the right to take possession of the blanket as inventory necessarily implied the authority to lift or move it. Upon exercising that authority and moving the blanket the pistol came into plain view and the officer was entitled to possess it for safe keeping. The instant case is distinguishable because the bandana is not a valuable item for purposes of an inventory and the officer did not consider it as such.

Under the plain view doctrine it must be "immediately apparent to the police that they have evidence before them." Collidge v. New Hampshire, 403 U.S. 443 (1971). In the context of an inventory search conducted under AMC 3.03.010 it must have been immediately apparent to the officer that the item he was going to move or seize was "valuable" for purposes of listing it in the inventory. Just as a policeman does not have the right under the plain-view doctrine to seize an object in his view in order to examine it and determine if it is or would be evidence in a criminal prosecution, the APD officer did not have the right to seize a non-valuable

object in order to determine if there was a valuable property underneath it. "To assure that warranted searches do not result in 'exploratory rummaging,' the plain-view doctrine limits the right of seizure to items, the incriminating nature of which is immediately apparent to the searching officer." United States v. Wright, 667 F.2d 793, 797 (9th Cir. 1982). ("An officer cannot inspect or examine every item that falls within his vision . . . without contravening the Constitutional prohibition against 'exploratory rummaging.'") Id. at 798. Under APD Regulations and Procedural Manual, 3.03.010 (Exhibit 1).

The government does not argue that Officer Wisel had probable cause to search the vehicle for a weapon independent of an inventory search. The government cites no factors making it reasonable to conclude that Vickers may have been trying to hide something or prevent the officer from obtaining a view of an item lying about the vehicle. Compare United States v. Sanders, 631 F.2d 1309 (8th Cir. 1980) (probable cause that a brown packet on the floor contained drugs where defendant had prior drug conviction and police had information he supplied drugs to another when the defendant took something from his pocket and placed it beneath the seat and exhibited excited facial expression when the officers approached the vehicle).

The Supreme Court in Arizona v. Hicks, 480 U.S. 321 (1987), rejected the approach by some courts that it was permissible to seize an object based only

on a reasonable suspicion that the object was subject to seizure.  Professor LaFave suggest that after <u>Hicks</u>, "a close examination of items within a vehicle which has no other lawful basis cannot be justified on the ground that reasonable suspicion suffices for such a minimal intrusion." <u>See</u> 3 LaFave, Search and Seizure, § 7.5(b) (4th Ed. 2009)

The Supreme Court has drawn distinctions between searches and seizures in applying the plain view doctrine.  In <u>Arizona v. Hicks</u>, the court held that no seizure occurred when the police officer, called to the scene of a shooting incident, recorded serial numbers of stereo equipment he observed in plain view and which he believed had been stolen.  However, his action in moving the equipment to find the serial numbers constituted a search which was not support by probable cause. <u>See</u> also, <u>State v. Murray</u>, 527 P.2d 1303 (1974), <u>cert</u>. <u>denied</u> 421 U.S. 1004 (1975) (television serial numbers not within plain view because officers had to tilt the sets to find the numbers and nothing about the location of the sets "looked incongruous" enough to satisfy the "immediately apparent" requirement).

A search implies a prying into hidden places for something that is concealed. <u>See</u> <u>United States v. Ramos-Osequera</u>, 120 F.3d 1028, 1036 (9th Cir. 1997), <u>cert</u> <u>denied</u> 118 S. Ct. 1094 (1998) (inventory search procedures authorizing the cataloguing and safe keeping of visible property did not authorize search of pocket of jeans).  It is not a search however, for an officer to observe or hear

something by using his natural senses. <u>See</u> 1 LaFave, Search and Seizure § 2.2 (4th Ed. 2009).

In <u>Florida v. Wells</u>, 495 U.S. 1 (1990), the Supreme Court held that absent a policy with respect to the opening of closed containers encountered during an inventory search, the inventory search conducted which involved the opening of a locked suitcase was not sufficiently regulated to satisfy the Fourth Amendment. Wells was stopped for speeding. Wells agreed to accompany the trooper to the police station to take a Breathalyzer test. He gave his permission to the officer to open the trunk of the car he was driving. An inventory search of the car turned up a locked suitcase in the trunk. Under the troopers direction, the suitcase was opened and marijuana discovered. The marijuana found in the suitcase was subject to suppression. The record in <u>Wells</u> contained no evidence of any highway patrol policy on the opening of closed containers found during inventory searches.

The <u>Wells</u> court held that standardized criteria must regulate the opening of containers found during inventory searches based on the principle that an inventory search must not be a ruse for general rummaging in order to discover incriminating evidence. The policy or practice governing the inventory searches should be designed to produce an inventory. The individual police officer must not be allowed so much latitude that inventory searches are turned into "a purposeful and general means of discovering evidence of crime." 495 U.S. at 4.

The court in <u>Wells</u> added that the police officer may be allowed sufficient latitude to determine whether a particular container should or should not be opened in light of the nature of the search and the characteristics of the container itself. The court opined that it would be permissible (under the Fourth Amendment) to allow the opening of closed containers whose contents officers determined they were unable to ascertain from examining the containers' exteriors. "The allowance of the exercise of judgment based on concerns related to the purposes of an inventory search does not violate the Fourth Amendment." *Id.* The Anchorage Municipal Code does not allow APD officers such latitude.

The <u>Wells</u> Court found the Florida Highway Patrol had no policy whatever with respect to the opening of closed containers encountered during an inventory search. Thus, the absence of such a policy led to the holding that the search was not sufficiently regulated to satisfy the Fourth Amendment and that the marijuana which was found in the suitcase was properly suppressed by the Supreme Court of Florida. The U.S. Supreme Court held that police may not be given total discretion to decide whether to open closed containers found during an inventory search.[3] Concurring separately, Justice Blackman wrote that the Supreme Court

_____

[3] In his dissent Justice Brennan, with whom Justice Marshall joined, found the majority statement that a State may adopt an inventory policy that vests individual police officers with some discretion to decide whether to open such containers as pure dictum. The dissenters in <u>Wells</u> wrote that an inventory search is reasonable under the Fourth Amendment only if it is done in

cases establish that an individual police officer cannot be given complete discretion in choosing whether to search or leave undisturbed containers and other items encountered during an inventory search. <u>Wells</u> at 11. Justice Blackman also disagreed with the majority that an individual policeman could be afforded discretion in conducting an inventory search as opposed to a policy choosing a scheme with an objective standard criteria. <u>Wells</u> teaches that a standard criteria is needed, not just the exercise of a police officer at the scene to comply with <u>South Dakota v. Opperman</u>, <u>supra</u>, and <u>Illinois v. LaFayette</u>, 462 U.S. 640 (1983).

The government argues that Officer Michael Wisel acted reasonably when he moved the bandana to look under it. It is true that the Fourth Amendment does not prohibit all searches; it forbids only unreasonable searches and seizures. An inventory search may be conducted to the extent permitted pursuant to police inventory practices. In order to avoid being designated as an evidentiary search, the inventory practices must limit discretion. <u>Florida v. Wells</u>, <u>supra</u>. Thus, the fact that the inventory search was reasonable per se under the Fourth Amendment standard of objective reasonableness is not enough to comply with federal law limiting the officer's individual discretion in an inventory search.

Under the facts presented, Vickers would not have been able to post bail immediately for the charge of driving without insurance. He still would have

accordance with standard procedures that limit the discretion of the police.

been subjected to the search at the jail facility. The search of Vickers' person at the jail was the result of the lawful arrest for driving without insurance and not based solely on the seizure of the firearm from the vehicle.

The government argues that Officer Wisel would have been derelict to leave the firearm in the vehicle. That argument assumes that the gun was lawfully discovered. The remedy for seizing the gun in violation of the law is suppression of the evidence. The focus here is upon lawfulness of the seizure of the weapon not whether it should have been left in the vehicle once discovered. If the police have probable cause that there are seizable items in the vehicle, these objects can be obtained by the police without reliance upon the power to inventory.

Cady v. Dombrowski, 413 U.S. 433 (1973) teaches that, if the police have reason to believe there is a gun in the car they may search the vehicle for the weapon in order to protect the public. In Dombrowski, officers searched the trunk of an impounded vehicle to find the driver's revolver, knowing that he was a police officer required to carry a service revolver at all times and he did not have a revolver when he was arrested for drunk driving. The Supreme Court approved the warrantless search because there was probable cause to believe the vehicle contained a weapon.

Officer Wisel's inventory practice to move an item of clothing during an inventory search to see if there is something underneath it may be valid under Putzel

if the article of clothing would arguably qualify as a valuable item. <u>Putzel</u> does not provide authority for the movement "of any" item in the vehicle being impounded. It is not sufficient that the inventory is the standard practice of the particular officer. <u>United States v. Kordocky</u>, 909 F.2d 219 (7th Cir. 1990).

The government has not offered as authority any policy of APD or the Municipality to avoid the "plain view" limitation of AMC 9.28.026. Because the seizure of the firearm from the vehicle was not a valid inventory search the court need not address the defendant's argument that the officer used the inventory search as a ruse to get into the car to look for things of evidentiary value.

## C. Fruits of the Unlawful Search

Vickers argues that the search by the correctional officer is tainted by the unlawful inventory search and that the evidence resulting from the search at the jailhouse should be suppressed under <u>Wong Sun v. United States</u>, 371 U.S. 471 (1963). The exclusionary rule precludes law enforcement officers from using "information obtained in violation of the Fourth Amendment to . . . [justify] a search." <u>United States v. Roberts</u>, 747 F.2d 537, 541 (9th Cir. 1984). Under the doctrine of the "fruit of the poisonous tree" evidence may not be used if the evidence to which the instant objection is made has come at by exploitation of the primary illegality but not if the evidence is obtained by means sufficiently distinguishable to be purged of the

primary taint.  <u>United States v. Comprehensive Drug Testing, Inc.</u>, 513 F.3d 1085, 1105 (9th Cir. 2008).

Before the inventory search was conducted, Officer Clark had already arrested Vickers, placed him in handcuffs and placed him in his police vehicle. Vickers was arrested for driving without insurance.  The officer did not rely upon the inventory search to establish probable cause for this arrest.

Vickers argues that had he not been arrested for the charge of being a felon in the possession of a firearm his bail set by the magistrate would have been no greater than the $250 set for the charge of driving without insurance.  He claims that he might have been able to post that bail immediately, implying that he would not have been searched by the correction officer.

It is clear under the law that a defendant should not prevail in a tainted fruits argument merely because "but for" the facts of the prior illegal search the subsequent item would not have been uncovered. <u>See</u> 6 LaFave Search and Seizure,  § 11.4(f) (4th Ed. 2009)  Case law provides no litmus test which can be applied to the instant case.   In <u>Wong Sun v. United States</u>, the court declined to hold "that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police."

In the instant case, the illegally gained knowledge of the gun in the vehicle formed the impetus and basis for charging Vickers with felon in possession

of a firearm. The arrest of Vickers on this charge cannot be considered an independent source removed from the taint of the original illegal search. The government does not argue that this criminal charge should stand if the evidence of the inventory search is suppressed. The issue is whether the processing of Vickers at the local jail on the valid charge of driving without insurance and an invalid charge of felon in possession of a firearm constitutes an independent source supporting the jail house search of Vickers person.

The firearm observed from the illegal inventory at the scene of the traffic stop prompted Officer Clark's decision to charge Vickers under State law rather than the Municipal code. But that discovery did not prompt the officer to arrest Vickers at the scene because the officer had already made that decision. The question is not what would have actually happened had the inventory search not disclosed the firearm, rather, what counts is whether the actual illegal inventory search had any effect in producing the jail house inventory search. The motivation for the jail house search was not prompted by Officer Wisel's search of the vehicle.

Vickers argues that but for the illegal inventory search Vickers would have been eligible for making bail without being processed for the remaining charge of driving without insurance. It is understandable that the jail processed Vickers, including inventorying the items on his person, since he was present at the facility after being arrested for felon in possession of a gun as well as driving without

insurance.  Presumably the officers involved would have followed the Alaska State law including <u>Zehrung v. State</u>, 560 P.2d 189 (1977) if a different factual scenario had been presented to them.

In <u>Zehrung</u>, the trial court had denied a rape defendant's motion to suppress certain credit cards found in his wallet during an inventory search at the Anchorage Jail following his arrest on misdemeanor charges.  The Alaska Supreme Court suppressed the evidence holding that "when one is arrested and brought to a jail for a minor offense for which bail has already been set in a bail schedule he should be allowed a reasonable opportunity to attempt to raise bail before being subjected to the remand and booking procedures and the incident inventory search." *Id.* at 195.  Applying this rule, the court held that the warrantless jail house inventory search of Zehrung's wallet was without justification, since his employer had arrived and offered to make bail within minutes of the arrest.

In the instant case the record does not show exactly what the bail would have been.  It does not show whether Vickers had $250 in his pocket or whether he would have been able to call someone to come immediately and post the scheduled bail amount for the offense of driving without insurance before he would have been processed.

Federal law governs the admissibility of evidence in the instant prosecution.  The Alaska Constitutional guarantee against unreasonable searches

and seizures is more broad than the Fourth Amendment guarantees.  <u>Zehrung</u>, at 199.  In <u>Zehrung</u> the Alaska Supreme Court held that the current procedure at the jail (requiring complete processing of an arrestee, including inventory of his property, even if the arrestee is able to post bail at the time he arrives at the jail) unconstitutional under the Alaska Constitution.  The court discussed similar contemporary procedures in other jurisdictions and noted that some jurisdictions follow the procedure struck down by the Alaska Supreme Court.  In dicta the court wrote "[s]ince Zehrung's search was incident to a lawful custodial arrest, his federal Constitutional rights were not violated by the search." *Id.*

Any rational assessment of application of the fruit of the poisonous tree doctrine must take into account the objective of deterrence.  <u>See</u> <u>Brown v. Illinois</u>, 422 U.S. 590 (1975).  Justice Powell in his concurrence, stated "[t]he notion of the 'dissipation of the taint' attempts to mark the point at which the detrimental consequences of illegal police conduct become so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost." *Id.* at 609.  The correctional officer was unaware of the inventory search conducted at the place of arrest.  The purpose of exclusion is to make "those administering the criminal law understand that they must do it that way."  <u>Bynum v. United States</u>, 262 F.2d 465 (D.C. Cir. 1958).  It is hard to conclude that an officer conducting an inventory on a vehicle being impounded would contemplate what evidence might be found on the driver if

he were processed into the jail facility.  Here, different officers arrested Vickers and conducted the inventory.

In <u>Brown v. Illinois</u>, <u>supra</u>, the court provided an analysis to assess the connection between an illegal arrest and a confession.  The three enumerated factors in that situation include "temporal proximity," "the presence of intervening circumstances" and "the purpose and flagrancy of the official misconduct." *Id.* at 603-604.  As for the first factor, it does not make any difference how much time elapsed between the inventory search of the vehicle and the defendant's processing at the jail.  Regarding the "purpose and flagrancy factor," no such flagrancy exists in the instance case.  The absence of "purpose and flagrancy" does not alone dissipate the taint, but Professor LaFave suggests this would require less by way of intervening circumstances as compared to cases in which the Fourth Amendment violation was flagrant and undertaken for the purpose of seeking the specific evidence.  6 LaFave Search and Seizure, § 11.4(g), p.350.

Vickers' motion to suppress the bullets is premised on the fruits of the poisonous tree doctrine not an independent Fourth Amendment violation.  Upon due consideration of the totality of the circumstances, the magistrate judge declines to extend the exclusionary rule to the fruits of the jail house search of Vickers when he was booked into the jail.  Upon considering the deterrence objective of the exclusionary rule the

purpose of depriving the government of any gain is to remove any incentive which exists toward the unlawful practice. The focus is forward-to prevent future violations, not punish for past ones. Consequently, where the chain between the challenged evidence and the primary illegality is long or the linkage can be shown only by 'sophisticated argument,' exclusion would seem inappropriate. In such a case it is highly unlikely that the police officers foresaw the challenged evidence of the probable product of their illegality; thus it could not have been a motivating force behind it. It follows that the threat of exclusion could not possibly operate as a deterrent in that situation. Absence this, exclusion carries with it no benefit to society and should not prejudice society's case against a criminal.

Comment, 115 U.PA.L.Rev. 1136, 1148 (1967). For reasons discussed above the motion to suppress the ammunition should be denied.

## Summary

The Motion to Suppress the gun found during the inventory search of the vehicle driven by Vickers on March 22, 2011, Docket 13, should be GRANTED. The exclusionary rule does not require the suppression of the bullets found by the

correctional officer at the jail.  The Motion to Suppress the bullets, Docket 14, should be DENIED.  IT IS SO RECOMMENDED.


DATED this 23rd  day of September, 2011, at Anchorage, Alaska.


*/s/ John D. Roberts*
JOHN D. ROBERTS
United States Magistrate Judge

***The shortened objection and response deadlines are necessary due to the looming trial date.***  D.Ak.L.M.R. 6(a) authorizes the court to alter the standard objection deadlines.  A party seeking to object to this proposed finding and recommendation shall file written objections with the Clerk of Court no later than **NOON, September 27, 2011.**

Failure to object to a magistrate judge's findings of fact may be treated as a procedural default and waiver of the right to contest those findings on appeal. The Ninth Circuit concludes that a district court is not required to consider evidence introduced for the first time in a party's objection to a magistrate judge's recommendation.

Objections and responses shall not exceed **five (5) pages** in length, and shall not merely reargue positions presented in motion papers.  Rather, objections and responses shall specifically designate the findings or recommendations objected to, the basis of the objection, and the points and authorities in support.

Response(s) to the objections shall be filed on or before **NOON, September 29, 2011.** The parties shall otherwise comply with provisions of D.Ak.L.M.R. 6(a).